**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-CIV-23604-SIMONTON**

**ERIC LEOTIS SCOTT,**

        **Plaintiff,**

  **v.**

**NANCY A. BERRYHILL, Acting Commissioner**
**of Social Security Administration,**

        **Defendant.**

_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the cross-motions for summary judgment filed by Plaintiff Eric Leotis Scott ("Plaintiff") and by Defendant Nancy A. Berryhill, Acting Commissioner of Social Security Administration ("Defendant"), ECF Nos. [26] and [29]. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge to conduct any and all proceedings in this case, ECF No. [23]. The summary judgment motions are now ripe for disposition.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Summary Judgment, ECF No. [26] be **GRANTED**, and Defendant's Motion for Summary Judgment, ECF No. [29] be **DENIED**.

## I.   PROCEDURAL BACKGROUND

In August 1998, at the age of three, Plaintiff was found disabled based on an application for Social Security Income. (R. 77). The Plaintiff turned 18 on March 14, 2012, triggering the requirement that the Plaintiff's eligibility for disability benefits be redetermined under the rules for determining disability in adults. (R. 77). The agency conducted a disability review, and on August 9, 2012, it was determined that Plaintiff's

disability had ceased as of August 1, 2012, because he did not meet the adult requirements for disability. (R. 77). Upon Plaintiff's request for reconsideration, the Commissioner's disability hearing officer conducted a hearing on April 23, 2013. (R. 165-169). A decision was issued on June 10, 2013, affirming the cessation of Plaintiff's disability benefits. (R. 179).

Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. 77). A hearing was commenced on October 16, 2014, but the Plaintiff had been unable to obtain counsel and requested a one-time postponement so that he could do so. (R. 140). A hearing was held on February 6, 2015. (R. 93, 264). Plaintiff was unrepresented, and signed a waiver of his right to representation. (R. 93). On March 16, 2015, the ALJ issued a decision finding that Plaintiff's disability ended on August 1, 2012, and that Plaintiff had not become disabled again since that date. (R. 77-85). The Plaintiff requested a review of the ALJ's decision, which was denied by the Appeals Council on July 6, 2016, ECF No. [1] at 2.

Having exhausted all administrative remedies, the Plaintiff timely filed the pending Complaint seeking judicial review of the administrative proceedings, ECF No. [1]. The Plaintiff requests this Court to reverse for an award of benefits, or, in the alternative, the Plaintiff requests this Court to remand this matter to the Commissioner for reconsideration of the evidence, ECF No. [1] at 4.

## II.   LEGAL ISSUES PRESENTED

In his Motion for Summary Judgment, the Plaintiff contends that the ALJ committed errors which precluded the Plaintiff from obtaining benefits. The alleged errors can be summarized as the Plaintiff alleging that the ALJ failed to properly assess the medical evidence of record, failed to conduct a proper credibility assessment, and failed to develop a full and fair record, ECF No. [26].

The Defendant contends in its Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment that substantial evidence supports the ALJ's assessment of Plaintiff's symptoms, any error by the ALJ in failing to address a medical source opinion was harmless, substantial evidence supports the ALJ's Step Five finding, and the ALJ fully and fairly developed the record, ECF No. [29].

III.   **STANDARD OF REVIEW**

 Judicial review of the ALJ's decision in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's factual findings and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, (1971); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence" is more than a scintilla, but less than preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Bloodworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

When reviewing the evidence, the Court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence "preponderates" against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence.  *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989).  This restrictive standard of review, however, applies only to findings of fact.  No presumption of validity attaches to the Commissioner's conclusions of law, which are reviewed de novo, including the determination of the proper standard to be applied in reviewing claims.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) ("The Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for

determining that the proper legal analysis has been conducted mandates reversal.");
*Martin v. Sullivan*, 894 F.2d at 1529.

## IV.  FRAMEWORK FOR ANALYSIS

Section 1614(a)(3)(H) of the Social Security Act of 1935 (the "Act") provides that individuals who are eligible for supplemental security income benefits under the age of eighteen must have their disability redetermined at age 18 under the rules for disability used for adults. *Demps v. Astrue*, No. 3-10-cv-621-J-12MCR, 2011 WL 4530843, at *3 (M.D. Fla. Aug. 2, 2011), report and recommendation adopted, No. 3:10-cv-621-J-12MCR, 2011 WL 4549603 (M.D. Fla. Sept. 29, 2011).  Additionally, the Act provides that the medical improvements review standard in section 1614(a)(4) does not apply to disability redeterminations at age 18.  *Id.*  Instead, the definition of disability that must be applied is the definition used for adults who file new applications for supplemental security income benefits based on disability.  *Id.*

Under this standard, the Social Security Administration applies a five-step sequential analysis to make a disability determination.  20 C.F.R. § 416.920(a)(4).[1]  The analysis follows each step in order, and the analysis ceases if at a certain step the ALJ is able to determine, based on the applicable criteria, either that the claimant is disabled or that the claimant is not disabled.

### A.  Step One

Step one is a determination of whether the claimant is engaging in substantial gainful activity.  20 C.F.R. § 416.920(b).  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. § 416.972(a).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is

---

[1] The regulations in effect at the time of the ALJ's decision have been used throughout the parties' briefs and in this Report and Recommendation.  The undersigned notes, however, that effective January 17, 2017, the regulations with respect to the evaluation of mental illness were revised.  81 Fed. Reg. 66138-01, 2016 WL 5341732 (Sept. 26, 2016).

realized. 20 C.F.R. § 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in substantial gainful activity. 20 C.F.R. §§ 416.974, 416.975. If an individual has been participating in substantial gainful activity, he will not be considered disabled, regardless of physical or mental impairment, despite the severity of symptoms, age, education, and work experience. The analysis proceeds to step two if the individual is not engaging in substantial gainful activity.

In the case at bar, there was no step one determination because it is not used when redetermining disability at age 18. *See* 20 CFR 416.987(b).

### B. Step Two

At the second step, the claimant must establish that he has a severe impairment. Step two has been described as the "filter" which requires the denial of any disability claim where no severe impairment or combination of impairments is present. *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). This step has also been recognized as a "screening" to eliminate groundless claims. *Stratton v. Bowen*, 827 F.2d 1447, 1452 (11th Cir. 1987). The ALJ makes a severity determination regarding a classification of the claimant's medically determinable impairment or combination of impairments. 20 C.F.R. § 416.920(c). To be severe, an impairment or combination of impairments must significantly limit an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 416.921(a). An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p.

In sum, an impairment or combination of impairments is considered to be not severe if it does not significantly limit a claimant's physical or mental ability to do basic

work activities.  20 C.F.R. § 416.921(a).  Basic work activities are the abilities and aptitudes necessary to do most jobs.  These include:  (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  C.F.R. § 416.921(b).

The evaluation of the severity of mental impairments is governed by 20 C.F.R. § 416.920(a).  This regulation sets forth a special technique to be used to determine whether a mental impairment is severe at step two.  Specifically, the ALJ is required to rate the degree of limitation in four functional areas:  activities of daily living; social functioning; concentration, persistence, or pace; and, episodes of decompensation.  20 C.F.R. § 416.920a(c)(3).  A five-point scale is used to rate the degree of limitation in the first three areas:  none, mild, moderate, marked, and extreme.  The last area, episodes of decompensation, is rated on a four-point scale:  none, one, two, three, and four or more.  20 C.F.R. § 416.920a(c)(4).  If the degree of limitation in the first three areas is "none" or "mild" and the fourth area is "none," the impairment is generally considered "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation" in the ability to do basic work activities.  20 C.F.R § 416.920a(d)(1).

If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled and the analysis ends here.  If the ALJ finds that the claimant has a severe medically determinable impairment or combination of impairments, the process advances to the third step.

In the case at bar, the ALJ found that Plaintiff had the severe impairments of learning disorder, schizoaffective disorder depressed type with psychosis, mood

disorder, and bipolar disorder. (R. 79). Because the ALJ found at least one severe impairment, the ALJ then proceeded to the next step.

**C.** <u>Step Three</u>

The third step requires the ALJ to consider if Plaintiff's impairment or combination of impairments is at the level of severity to either meet or medically equal the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 ("the Listings"). A claimant is considered to be disabled if his impairment or combination of impairments: 1) is severe enough to meet or to medically equal the criteria of a listing; and 2) meets the duration requirement under 20 C.F.R. § 416.909. If the claimant's impairment or combination of impairments does not meet the criteria specified in the Listings, then the ALJ must proceed to the fourth step.

In the case at bar, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 79). In reaching this conclusion, the ALJ considered the criteria of listings 12.02, 12.03, and 12.04 and considered whether the "paragraph B" criteria were satisfied. (R. 79). With respect to these criteria, the ALJ found that the Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social function, and moderate difficulties as related to concentration, persistence or pace. (R. 29). As for episodes of decompensation, the ALJ found that the Plaintiff had not experienced any episodes of decompensation of extended duration. (R. 80). The ALJ noted that record "is devoid any [sic] evidence of inpatient hospitalizations for an exacerbation of any mental symptoms at any time pertinent to this decision." (R. 80). The ALJ also considered whether the "paragraph C" criteria were satisfied, and determined that the record was devoid of repeated episodes of decompensation, potential episodes of decompensation or the inability to function

outside a highly supportive living arrangement or outside the area of the claimant's home. (R. 80-81). The analysis then proceeded to step four.

### D. <u>Step Four</u>

Step four is a two-pronged analysis that involves a determination of whether the impairments prevent the claimant from performing his past relevant work. First, the ALJ must determine the claimant's Residual Functional Capacity ("RFC") as described in 20 C.F.R. § 416.920(e).[2] RFC measures a person's ability to do physical and mental work activities on a sustained basis despite limitations caused by their impairments. In making this determination, the ALJ must consider all of the claimant's impairments, regardless of the level of severity. 20 C.F.R. §§ 416.920(e), 416.945; SSR 96-8p; *Tuggerson-Brown v. Comm'r of Soc. Sec.*, No. 13-14168, 2014 WL 3643790, at *2 (11th Cir. Jul. 24, 2014) (an ALJ is required to consider all impairments, regardless of severity, in conjunction with one another in performing the latter steps of the sequential evaluation).

In the case at bar, the ALJ found that the Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: "the claimant would be limited to performing simple, routine, and repetitive tasks." (R. 83). The ALJ found that, "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms are not entirely credible."

After determining a claimant's RFC, the step four analysis requires a determination of whether a claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. § 416.965. In the case at bar, the ALJ determined that Plaintiff had no past relevant work. (R. 84).

---

[2]  Since the RFC is used at both step four and step five, this determination may also be characterized as an independent determination made between step three and step four.

Because the Plaintiff did not have any past relevant work, the ALJ proceed to step five.

### E. Step Five

If the claimant is not able to perform his past relevant work, the ALJ progresses to the fifth step. At this step, the burden of production shifts to the Commissioner to show that other work that the claimant can perform exists in significant numbers in the national economy. *Jones v. Apfel*, 190 F.3d 1224, 128 (11th Cir. 1999); 20 C.F.R. § 416.912(g) and 416.960(c). In making this determination, the ALJ considers a claimant's RFC as determined in connection with step four, as well as the claimant's age, education, and work experience to determine if he can perform any other work.

Based upon the testimony of the vocational expert ("VE") the ALJ found that the Plaintiff could perform work as a landscape laborer, cleaner, and laundry worker. (R. 36).

## V. PLAINTIFF'S BACKGROUND

### A. Background

At the time of his hearing, the Plaintiff was a 20 year-old man. (R. 81). The Plaintiff has a history of learning disorder; schizoaffective disorder, depressed type with psychosis; mood disorder; and bipolar disorder. (R. 81). The Plaintiff received childhood disability benefits based upon having met the childhood listing for organic mental disorders under 112.02 (A)(B). (R. 82.). The Plaintiff attended school through the eleventh grade, attending a combination of general and exceptional education classes, (R. 83), but did not graduate or receive any equivalent degree. (R. 99-100). At the time of his hearing, the Plaintiff was no longer enrolled in high school. (R. 99-100). The Plaintiff resides with his father. (R. 120). The Plaintiff testified that he is not and has never been employed. (R. 101-02).

On February 23, 2013, Patricia Scott, the Plaintiff's mother, completed a Function Report regarding the Plaintiff. (R. 379).[3] Ms. Scott has known the Plaintiff all his life and they lived together at the time she completed the report. (R. 379). Ms. Scott described the Plaintiff's daily routine as consisting of going to school, coming home, eating, going to his room, and listening to music or playing video games. (R. 380). She reported that the Plaintiff did not care for or assist with the care of anyone other than himself or any pets or other animals, but was able to take care of his own personal care and medications and did not need any reminders. (R. 380-81). The Plaintiff did not know how to cook and could not prepare his own meals, but he was able to clean his room and do yard work, though very slowly. (R. 381-82). The Plaintiff was able to go out alone on a daily basis, travelling by foot. (R. 382). He was able to shop for "video games, clothes, junk food" and he did so "three times a month;" it "takes hours." (R. 382). The Plaintiff did not pay bills, have his own bank accounts, or use checkbooks or money orders, but he was able to count change. (R. 382). Ms. Scott reported that the Plaintiff's disability affected his concentration, understanding, following instructions, and getting along with others and that he "has [an] attitude problem with me and everyone else." (R. 384). The Plaintiff follows written instructions very poorly and spoken instructions "somewhat ok," handles stress poorly, and his response to changes in his routine was unknown because he does the same thing every day. (R. 384-85). The Plaintiff did not take any medications at that time. (R. 386).

B. Medical History

On June 20, 2002, Dr. Jack R. Weitz conducted a Learning Disabilities Evaluation of the Plaintiff. (R. 544). The Plaintiff was eight years old at the time of this evaluation. (R. 544). Dr. Weitz was unable to provide a diagnosis of the Plaintiff's intellectual ability

---

[3] Ms. Scott also completed a Function Report on June 7, 2012. (R. 298-308). The answers therein are consistent with those provided in the more recent Function Report, so a duplicative recitation has been omitted.

or the presence of a learning disability due to the Plaintiff's failure to complete all the testing tasks. Dr. Weitz did, however, diagnose the Plaintiff with dysthymia, or persistent depressive disorder, noting that the Plaintiff had displayed feelings of inadequacy and low self-esteem. (R. 545). Dr. Weitz recommended mental health treatment for the Plaintiff and that his ability to manage his own benefits should be reevaluated upon reaching adulthood. (R. 545).

On July 24, 2012, Dr. Angela C. Brinson, Licensed School Psychologist, conducted a psychological evaluation of Plaintiff to aid in the determination of this case. (R. 565). At the time of this evaluation, the Plaintiff was 18 years of age. (R. 565). The Plaintiff arrived on-time and was appropriately groomed and attired. (R. 565). The Plaintiff was accompanied to the session by his maternal aunt, Patricia Ferguson. (R. 565). Dr. Brinson noted that "[the Plaintiff]'s level of attention and concentration were appropriate." (R. 566). On the Wechsler Adult Intelligence Scale (WAIS-IV) test to assess intellectual functioning, Dr. Brinson concluded the Plaintiff is functioning "in the Borderline range of intellectual ability relative to his same age peers." (R. 566). Specifically assessing the Plaintiff's working memory abilities, which involve "attention, concentration, mental control, and reasoning," Dr. Brinson concluded that the Plaintiff's working memory skills are in the low average range. (R. 566). Dr. Brinson also administered the WJ-III to assess the Plaintiff's current level of academic achievement, and concluded the Plaintiff was functioning in the "low average to deficient range of academic achievement," scoring on a 5th grade level for Broad Reading, and on a sixth grade level for Broad Mathematics. Dr. Brinson ultimately concluded that the Plaintiff's cognitive abilities are consistent with a learning disorder. (R. 569).

On August 8, 2012, Alicia Maki, Ph.D., completed a Form 2506 psychiatric review of the Plaintiff. (R. 584). Dr. Maki noted that the Plaintiff has "[n]o past [history] of mental health [treatment] nor [history] of psych hospitalizations." (R. 584). Dr. Maki

concluded that the Plaintiff's statements as to his disability were partially credible, because the "alleged impairments are supported by MER.[4] (R. 584). However, functional/adaptive capacity is not affected as suggested." (R. 584).

On September 7, 2012, the Plaintiff was referred by his high school for an evaluation with Dr. Sean Haven in connection with behavioral issues he was having at school. (R. 82, 591). The Plaintiff reported he was getting into fights at school, usually triggered by other students making fun of his appearance, but sometimes because he makes fun of other students. (R. 591). The Plaintiff denied feeling depressed or anxious and stated he was sleeping enough and was not experiencing hallucinations. (R. 591). However, the Plaintiff reported that in the past he used to see "shadows that would change form." (R. 591). The Plaintiff indicated to Dr. Haven that he wanted to be "extreme" – pursuing such activities as sky-diving and shark diving. (R. 591). Dr. Haven noted at this time that the Plaintiff had no past psychiatric history or past psychiatric medications. (R. 591). Dr. Haven diagnosed the Plaintiff with a mood disorder and explained: "P[atien]t refused medication this session. Will come back in 1 mo[nth]. To re-evaluate need for treatment." (R. 593).

On March 8, 2013, Catherine Nunez, Ph.D., completed a Form 2506 psychiatric review of the Plaintiff. (R. 613). Dr. Nunez noted that the Plaintiff is diagnosed with a mood disorder but has refused to be compliant with [treatment]." (R. 625). Dr. Nunez concluded that "[c]laimant is considered credible in his report of [symptoms]. . . . General functioning is consistent with the ability to complete simple tasks. There is no MSO in the file. Based on the MER, claimant can complete SRTs in a work setting and does not meet listing severity." (R. 625).

On August 9, 2013, Dr. Poitier of New Horizons Community Mental Health Center, Inc. completed a Psychiatric Evaluation of the Plaintiff. (R. 641). Dr. Poitier reported that

_____

[4] The acronym "MER" stands for medical evidence of record.

the Plaintiff's chief complaint is that "I see myself as a future God." Dr. Poitier reported that the Plaintiff denied any past psychiatric history of hospitalizations of family history. (R. 641). Dr. Poitier diagnosed the Plaintiff with psychiatric disorder, unspecified. (R. 643). Dr. Poitier's treatment notes include a medication profile which provides that from August 9, 2013 to November 20, 2013, Dr. Poitier prescribed four different drugs to treat the Plaintiffs mental health issues. (R. 635). A form providing "Claimant's Medications" was also submitted by or on behalf of the Plaintiff on April 23, 2014. (R. 473). It reflects that at that time the Plaintiff was prescribed Citalopram, Benztropine, Diphenhydramine, and Risperdal by Dr. Joseph Poitier at the New Horizon Clinic. (R. 473).

On October 15, 2014, Patricia Ares-Romero, Medical Director of the Psychosocial Rehabilitation Program at Jackson Behavioral Health Hospital, submitted a one-page letter identifying the Plaintiff as a patient in the hospital's Psychosocial Rehabilitation Program with a working diagnosis of Schizoaffective disorder, depressed type. (R. 631). Dr. Ares-Romero stated that the Plaintiff is being prescribed Celexa to target his depressive symptoms, Haldol Decanoate to target his psychosis, and Cogentin for side effects from the psychotropics. (R. 631). Dr. Ares-Romero closed her submission with a request that the Social Security Administration "[p]lease advise if you require any further information." (R. 631).

On February 2, 2015, Dr. Luis Chaves[5] at 1660 NW 7th Court, Miami, FL 33136 completed a Psychiatric and Psychosocial Evaluation of the Plaintiff. (R. 658). Importantly, though the Plaintiff testified at the hearing that he had never met with Dr. Chaves prior to the day of the evaluation, Dr. Chaves' opinion noted that the Plaintiff has been treated within "this program since [March 25, 2014]." (R. at 658). Dr. Chaves diagnosed the Plaintiff with schizophrenia, chronic paranoid type and depressive

---

[5] The parties erroneously refer to Dr. Chaves as "Dr. Caves."

disorder, not otherwise specified.  (R. at 658).  Dr. Chaves specified that the Plaintiff had

flat affect and depressed mood, described a history of auditory hallucinations, and that

the Plaintiff was currently reporting intermittent hallucinations consisting of voices

calling his name.  (R. 658).  Dr. Chaves' opinion stated that the Plaintiff was treated "one

to two times per month for 30 minutes at a time.  [Patient] is currently in the PSR,[6] he is

attending activities daily."  (R. 658).  Dr. Chaves' opinion stated that the Plaintiff was

prescribed Haldol Decanoate, Cogentin, and citalopram.  (R. at 659).  Dr. Chaves opined

that the Plaintiff's impairments would cause him to be absent from work an average of

more than four days per month.  (R. 660).  Dr. Chaves opined that the Plaintiff had

marked limitations in maintaining social functioning and concentration, persistence, or

pace resulting in frequent failure to complete tasks in a timely manner.  (R. 660).  Dr.

Chaves opined that the Plaintiff would experience four or more episodes of deterioration

or decompensation, of extended duration.  (R. 661).  Dr. Chaves reported that "[Patient]

had a psychiatric hospitalization on March 7, 2014 secondary to mood symptoms.  He

also had a psychiatric hospitalization on [July 25, 2014] secondary to paranoid ideation,

threatening his family, self-neglect, wandering at night." (R. 663).

     The record also contains a "Claimant's Recent Medical Treatment" document that

appears to have been completed by someone on behalf of the Plaintiff, which states that

he received medical treatment from Dr. Molly Ryan at 1660 NW 7th Court, Miami, FL 33136

---

[6] The undersigned believes that "this program" is a reference to the Psychosocial
Rehabilitation Program at Jackson Memorial Hospital.  In her submission, dated October
15, 2014, Dr. Patricia Ares-Romero, the Medical Director for the Psychosocial
Rehabilitation program identified the Plaintiff as a patient in the program and identified
the same medications prescribed to the Plaintiff as those identified by Dr. Chaves,
though Dr. Ares-Romero used the brand name Celexa rather than the generic name
citalopram.  (R. 631, 659).  Additionally, the address provided for Dr. Chaves corresponds
to the Jackson Memorial Hospital Highland Pavilion.

and provides a date of March 25, 2014.[7]  (R. 472).  With regard to the Plaintiff's condition, the document states "[the Plaintiff] has been going in and out of Dade County Jail.  Two different occasions and while there he was put in the mental hosp[ital]."  (R. 472).  The form further indicates that since July 17, 2013, the Plaintiff was hospitalized at Jackson Memorial Hospital for depression and received treatment in the form of prescriptions for Celexa and Risperidone.  (R. 472).  The document is marked as received by the Social Security Administration on April 23, 2014.

   C.  Hearing Testimony

      1.  Plaintiff's Testimony

   The Plaintiff appeared at hearings before the ALJ on October 16, 2014, and February 6, 2015, in Miami, Florida.  The Plaintiff was not represented by counsel at either hearing.  Plaintiff was unrepresented at the first hearing and elected to postpone the hearing in order to allow him to obtain counsel.  (R. 139).  The Plaintiff appeared before the same ALJ again on February 6, 2015.  When asked why he still had not obtained counsel, Plaintiff stated that "[w]e weren't able to get one yet," but was not able to provide any additional information regarding why no counsel was retained because the Plaintiff "just left it all to my mom."  (R. 93-94).  Plaintiff also could not explain what prevented him from continuing to work towards his high school diploma, finally suggesting the decision had been up to his mother – "she didn't never put me back in school.  I never went back."  (R. 101).

   The Plaintiff testified that he thought he could work full-time, and that he has looked for a job from time to time, but that no one would hire him.  (R. 102).  The Plaintiff had looked for jobs selling videogames, as that is a subject about which he knew some

---

[7] The undersigned notes that the addresses provided for Drs. Ryan and Chaves are identical and correspond to the Jackson Memorial Hospital Highland Pavilion.  (R. 472, 658).  Additionally, the date associated with Dr. Ryan's treatment of the Plaintiff is the same as the date on which Dr. Chaves reports that the Plaintiff joined the Psychosocial Rehabilitation Program.  (R. 472, 658).

information.  (R. 102-03).  The Plaintiff used to play videogames online but no longer had a Playstation.  The Playstation was no longer in his house when he got out of jail; "I guess it broke. I don't know."  (R. 104).  The Plaintiff was in jail for two months "[b]ecause I got jumped, and I got a gun, and I started firing at the boys that jumped me."  (R. 104).  The Plaintiff is not licensed to own a weapon and the gun was not his own.  (R. 104).

When asked about his learning disability, the Plaintiff stated that it still affected him and that "it's just hard to concentrate basically just on anything." (R. 106).  The Plaintiff testified that he was taking medications and the ALJ confirmed that the Plaintiff had correctly named three out of four of the medications he was currently prescribed, forgetting the name of the fourth.  (R. 106).   When asked how his learning disability prevented him from working, the Plaintiff responded "I don't—I don't – I'm not sure that it does." (R. 106).

When asked how his schizophrenia affected his ability to work, the Plaintiff expressed confusion, stating "I don't know what it means."  (R. 107).  The ALJ then concluded, "[s]o as far as you know, schizophrenia doesn't impact you at all," to which the Plaintiff replied "Not that I know of."  (R. 107).  The Plaintiff testified that he has seen demons and other things since he was a child; the demons don't do anything other than frighten the Plaintiff.  (R. 108).  The Plaintiff still sees things about once a month, usually when he wakes up in the middle of the night, and he is unable to move from the fear and feels vibrations through his body for a few minutes when he sees the thing.  (R. 110).  Due to his medication, however, he does not have the same frequency of visual hallucinations that he did as a child.  (R. 111).

Plaintiff could not remember anything about his psychosis, though he indicated that he had been told about it previously.  (R. 111).  When asked how he thought it might affect him, he replied that he was "trying to remember what it is."  (R. 111).   When asked

about specific delusions, he stated that he thought he was a prophet and had been "having visions and stuff" since "I wanted to kill myself" and "they kind of locked me up. But instead of them locking me up, they took me to crisis." (R. 111-12). The Plaintiff was unable to precisely describe what it meant to be a prophet and/or the religious significance, stating "I just see the good side. That's all" and "It's just the information I do be given, if I am given it from – it's like – I'm not sure if it's bad or good." (R. 113).

The Plaintiff testified regarding his involvement with "the program" "at Jackson" in Highland Park, which he described as "like a recovery program for us." (R. 115). Plaintiff testified the program was for both drug addicts and people with illnesses. (R. 116). Plaintiff testified that he attended the program daily, taking three buses each way, from 5 a.m. to around noon. (R. 116-17). Plaintiff testified that he was not required to attend, but that "I just go to the program because I feel as though I still need it." (R. 117).

The Plaintiff testified that his depression and schizoaffective disorder make him want to kill himself and that he has previously attempted to take his life. (R. 117-18). He stated that he consumed more than the recommended dosage of his prescribed medications a few weeks prior but that nothing really happened. (R. 118).

When asked why Plaintiff believed that he was disabled such that he could not work a full-time job, Plaintiff responded that he believed he could work full-time and that he would take a job if he was offered one. (R. 119).

Plaintiff did not know how much income he received each month; he received all of his money from his mother. (R. 120). Plaintiff could not estimate the amount of money he received from his mother on a monthly basis, saying "It could be anything. It could be $20 to a couple dollars, anything like that." (R. 121).

The Plaintiff testified that the last book he read was the Bible, specifically Revelations, and that his favorite part of the Bible is the ending, "when we all get to see God's face." (R. 124).

## 2. <u>Vocational Expert Testimony</u>

Lisa Gaudi testified as an impartial Vocational Expert. (R. 125). The Plaintiff has no past work experience, so the testimony concerned only whether there were jobs in the national economy that the Plaintiff could perform based on the Plaintiff's RFC, as described in the hypotheticals posed by the ALJ. The ALJ presented four hypotheticals to the VE. First, the ALJ posed the following question:

> I'd like to have you assume an individual of the same age, education, and past work experience as the claimant possessing the residual functional capacity to perform work at all exertional levels except work is limited to simple, routine, and repetitive tasks. Would an individual with these limitations be able to perform any work in either the local or national economy?

(R. 126). The VE responded that the full range of unskilled work would be suitable in this case, and provided the specific examples of landscape laborer, commercial cleaner, and kitchen helper. (R. 126-27).

The ALJ then presented the following hypothetical:

> "[A]ssume all of the limitations as above. And add this person's mental capabilities include understanding, remembering, and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work; responding appropriately to supervision, coworkers, and unusual work situations; and dealing with changes in a routine work setting. Are there jobs in either the local or national economy that such an individual could perform?

The VE responded that the previously identified work would still be suitable. (R. 127).

The ALJ then presented the following hypothetical:

> [A]ssume all of the limitations as above in hypotheticals one and two, and add work can be around coworkers throughout the day but with only occasional interaction with them. Are there jobs in either the local or national economy that such an individual could perform?

The VE responded that the previously identified work would still be suitable. (R. 128).

The ALJ then presented the following hypothetical:

> [A]ssume all of the same limitations as above and add due to mental deficits, this person cannot sustain sufficient concentration, persistence, or pace for an eight-hour day work schedule. Would an individual with

these limitations be able to perform any work in either the local or national economy?

The VE responded that such an individual would not be able to perform any work in either the local or national economy. (R. 128).

## VI. LEGAL ANALYSIS

### A. The Opinion Evidence of Record

#### 1. The Framework for Analyzing Medical Opinions

The Plaintiff argues that the ALJ failed to properly asses the opinion evidence of record. Specifically, the Plaintiff argues that the ALJ erred by failing to consider the medical opinions of Drs. Chaves, Ryan, Poitier, and Weitz, ECF No. [26] at 8, 13. An ALJ is required to consider and explain the weight given to different medical doctors such as treating, examining, and consulting physicians. *See Martinez v. Acting Comm'r of Soc. Sec.,* No. 15-14798, 2016 WL 4474675 at *2 (11th Cir. Aug. 25, 2016). The Social Security regulations provide guidelines for the ALJ to use when evaluating medical opinion evidence. *See* 20 C.F.R. § 404.1527. The ALJ considers many factors when weighing such evidence, including the examining relationship, the treatment relationship, whether an opinion is well-supported, whether an opinion is consistent with the record, and the area of a doctor's specialization. *Id.* § 404.1527(d). Generally, the medical opinions of professionals who provided treatment are given more weight than the opinions of those who only examined a claimant because "[treating] sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." *Id.* § 404.1527(d)(2). With good cause, an ALJ may disregard a treating physician's opinion, but he must clearly articulate his reasons for doing so. *Phillips*, 357 F.3d at 1240–41. Moreover, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir.1987). A statement that the ALJ carefully considered

all the testimony and exhibits is not sufficient. *Cowart v. Schweiker*, 662 F.2d 731, 735

(11th Cir.1981). Without an explanation of the weight accorded by the ALJ, it is

impossible for a reviewing court to determine whether the ultimate decision on the merits

of the claim is rational and supported by substantial evidence. *Id.* Therefore, when the

ALJ fails to state with at least some measure of clarity the grounds for his decision, the

court cannot affirm simply because some rationale might have supported the ALJ's

conclusion. *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir.1984).

In *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011), the

Eleventh Circuit Court of Appeals concisely set forth the following guidelines to apply in

evaluating an ALJ's treatment of medical opinions:

> Absent "good cause," an ALJ is to give the medical opinions of treating
> physician's substantial or considerable weight. Good cause exists when
> the: (1) treating physician's opinion was not bolstered by the evidence; (2)
> evidence supported a contrary finding; or (3) treating physician's opinion
> was conclusory or inconsistent with the doctor's own medical records.
> With good cause, an ALJ may disregard a treating physician's opinion, but
> he must clearly articulate the reasons for doing so.
>
> Moreover, the ALJ must state with particularity the weight given to different
> medical opinions and the reasons therefore. In the absence of such a
> statement, it is impossible for a reviewing court to determine whether the
> ultimate decision on the merits of the claim is rational and supported by
> substantial evidence. Therefore, when the ALJ fails to state with at least
> some measure of clarity the grounds for his decision, we will decline to
> affirm simply because some rationale might have supported the ALJ's
> conclusion.

(internal quotation marks and citations omitted). In *Winschel*, the decision of the ALJ

was reversed because the only reference to the treating physician noted that the

claimant had seen the doctor monthly, but did not even mention the doctor's medical

opinion. In addition, the ALJ failed to discuss the pertinent elements of an examining

physician's medical opinion. The Court noted that it was possible that the ALJ had

considered and rejected those opinions, but without clearly articulated reasons, the

Court could not determine whether the ALJ's conclusions were supported by substantial

evidence. 631 F.3d at 1179. Similarly, the ALJ's rejection of a treating physician's opinion was error requiring remand where the ALJ had failed to reference the opinions in his decision and had merely noted that the claimant had been treated by the physicians, *Miller v. Barnhart*, 182 F. App'x 959, 964 (11th Cir. 2006); and, where the reasons given for according no weight to the opinion – that the opinion was internally inconsistent and at odds with other evidence in the record – was not supported by substantial evidence, *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

On the other hand, in *Rosario v. Comm'r of Soc. Sec.,* 490 F. App'x 192, 194-95 (11th Cir. 2012), the Eleventh Circuit found that the ALJ had not erred in giving little weight to the opinions of the claimant's treating psychiatrist, where the ALJ indicated she had done so "because they were inconsistent with [the doctor's] own findings, notes from the treatment plan, and the overall medical evidence," and the decision noted one example from the medical records. 490 F. App'x at 194-95. *Accord Phillips v. Barnhart,* 357 F.3d 1232, 1240-41 (11th Cir. 2004) (ALJ's rejection of treating physician's opinion was supported by substantial evidence where ALJ cited examples of inconsistencies with treatment notes and claimant's own admissions of what she could do).

In sum, if the ALJ fails to give at least great weight to the opinion of a treating physician, he or she must provide a sufficiently detailed analysis with examples to demonstrate why that opinion is discounted, and provide a rationale that will enable a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.

a. Dr. Chaves' Opinion

The Plaintiff asserts that the ALJ erred by failing to consider, or even mention, the Plaintiff's treating psychiatrist's (Dr. Chaves') opinion in its entirety, according inadequate weight to the opinions expressed by the treating psychiatrist, and repeatedly omitting clinically significant findings contained in the treating psychiatrist's treatment

notes, ECF No. [26] at 8-12. As an initial matter, Defendant contests the assertion that Dr. Chaves was the Plaintiff's treating physician, ECF No. [29] at 13. Defendant further argues that any error by the ALJ in not specifically addressing Dr. Chaves' opinion was harmless, ECF No. [29] at 12-16. Defendant additionally argues that (1) Dr. Chaves failed to provide objective evidence to support his opinion or an explanation for his conclusion that Plaintiff had marked limitations; (2) Dr. Chaves' opinion is inconsistent with the objective medical evidence; (3) Dr. Chaves' opinion is so patently deficient that the ALJ could not have given any weight to it without violating the requirement that substantial evidence support her decision, ECF No. [29] at 13-14.

The ALJ's report notes that "[a]dditional evidence was submitted at the hearing and subsequently reviewed (Exhibits 15F, 16F)." Other than this reference to Dr. Chaves' report, which was marked as Exhibit 16F within the record, the ALJ does not reference or mention the Chaves report or its content, nor does she assign a weight to his opinion regarding the Plaintiff's diagnosis and limitations.

The parties dispute whether Dr. Chaves' report is entitled to the weight accorded to a treating physician. The Social Security Regulations provide the following guidelines for evaluating whether a particular medical source is a treating source:

> Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. 404.1527(a) (2).

Based on the undersigned's review of the record, Dr. Chaves' opinion was entitled to the weight accorded to a treating physician. Although the Plaintiff testified at the hearing that he saw Dr. Chaves for the first time on the day that Dr. Chaves completed his evaluation, (R. 95-96), there is significant evidence in the record that supports the Plaintiff's ongoing treatment relationship within the Psychosocial Rehabilitation Program at Jackson Memorial Hospital, with which Dr. Chaves is associated. Dr. Chaves' report states that the Plaintiff has been receiving treatment within the Psychosocial Rehabilitation Program since March 25, 2014, attending activities in the program daily in addition to sessions twice monthly to manage his medications. (R. 658). Dr. Ares-Romero separately confirmed the Plaintiff's ongoing treatment within the Psychosocial Rehabilitation Program. (R. 631). The Plaintiff has also identified Dr. Molly Ryan as a treating physician, and, based on the address provided and date of first treatment, she also appears to be a physician within the Psychosocial Rehabilitation Program. (R. 472).[8] Thus, given the Plaintiff's ongoing treatment within the Psychosocial Rehabilitation Program, Dr. Chaves' opinion was entitled to the consideration accorded to a treating physician.[9]

---

[8] The unrepresented Plaintiff provided unclear testimony at the hearing regarding his treatment within the Psychosocial Rehabilitation Program and the records from various physicians associated with the program were submitted separately, so the ALJ's confusion regarding the program is understandable. Further development of the record, however, may have resolved some of this confusion and this issue will be addressed subsequently.

[9] Even assuming that Dr. Chaves was not considered a treating physician, he remains a medical source whose opinion was required to be considered. Due to the glaring omission of any discussion of Dr. Chaves' opinion, it remains error for the ALJ to have failed to discuss his opinion at all. *See* 20 CFR §§ 404.1527(c), 416.927(c); s*ee, e.g.*, *Martinez v. Acting Comm'r of Social Sec.*, No. 15-14798, 2016 WL 4474675, *3 (11th Cir. Aug. 25, 2016) ("The ALJ must evaluate every medical opinion received and determine what weight to give to that opinion."); *Baez v. Comm'r of Social Sec.*, No. 15-13941, 2016 WL 4010434, *3 (11th Cir. July 7, 2016) ("In evaluating medical opinions, the ALJ should consider factors such as the examining relationship, the treatment relationship, the

There are numerous statements in the ALJ's opinion that suggest the ALJ did not even consider Dr. Chaves' report. The ALJ's opinion states that "the record was devoid any [sic] contemporaneous treatment notes from Dr. Ares-Romero or Jackson Memorial Hospital," (R. 82), overlooking the opinion from Dr. Chaves. (R. 82). Notably, although Dr. Chaves notes that Plaintiff has been hospitalized twice and has been prescribed Celexa, Haldol, and Cogentin, the ALJ's opinion finds that "the record is devoid any [sic] evidence of inpatient hospitalizations for an exacerbation of mental symptoms at any time pertinent to this decision," (R. 80) and "the claimant has not taken any medications for those symptoms." (R 83).[10]

The ALJ never referenced the opinions of Dr. Chaves that the Plaintiff is likely to be absent from work more than four days per month; that he shows marked restriction in the areas of maintaining social functioning and concentration, persistence, and pace; and that the Plaintiff will experience four or more episodes of deterioration or decompensation of extended duration. (R. 660 – 61). Additionally, the ALJ never references the opinion of Dr. Chaves that the Plaintiff has exhibited psychotic features and deterioration from a previous level of functioning. (R. 663). Moreover, these opinions are contrary to the ALJ's residual functional capacity assessment because these opinions state that the Plaintiff has greater limitations than those determined by the decision. Thus, it appears that the ALJ did not give Dr. Chaves' opinion controlling weight. While it is possible that the ALJ considered Dr. Chaves' opinion and incorporated that opinion in her residual functional capacity assessment, she provided no explanation for the weight, or lack thereof, that she assigned to the opinion. The ALJ

doctor's specialization, whether the opinion is amply supported, and whether the opinion is consistent with the record. The RFC assessment must always consider and address the medical source opinions.").

[10] In fact, there are no treatment records from 2014, despite the reference to treatment by Dr. Chaves. This is a significant gap in the record, as discussed in more detail below.

stated that she considered the entire record.  A statement that the ALJ has considered all of the opinion evidence, however, is not sufficient to discharge her burden to explicitly set forth the weight accorded to that evidence.  *See Cowart*, 662 F.2d at 735.  Without a clear explanation of how the ALJ treated this opinion, the Court cannot determine whether the ALJ's conclusions were rational or supported by substantial evidence.  *See id*.

This Court need not address each of the Defendant's individual arguments, as it is the ALJ's responsibility to consider and explain the weight given to different medical doctors.  It is not the responsibility of the Defendant or this Court to supply post-hoc rationales for the ALJ's failure to consider the opinion of a physician.  As in *Winschel*, it is possible that the ALJ in the case at bar considered and rejected Dr. Chaves' opinion, "but without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence." 631 F.3d at 1179.  Because the ALJ did not explain why she was rejecting the opinion, this Court cannot determine whether she rejected it for one of the reasons suggested by the Defendant or for some other, unsupportable reason.  Although the ALJ is not required to specifically refer to every piece of evidence in the record, *Dyer*, 395 F.3d at 1211, she is required to explain the weight he afforded to "obviously probative exhibits," *Cowart*, 662 F.2d at 735.

Finally, the undersigned disagrees with the Defendant's contention that this error was harmless.  Dr. Chaves' report indicates that the Plaintiff has limitations beyond those determined in the ALJ's opinion and includes clinically significant findings that the ALJ states are absent from the record in her opinion.  It is possible that the ALJ had reason to disregard Dr. Chaves' report, but where, as here, "the ALJ fails to state with at least some measure of clarity the grounds for the decision, we will decline to affirm 'simply because some rationale may have supported the ALJ's conclusion.'" *Colon v.*

*Colvin*, 660 Fed. App'x 867 (11th Cir. 2016) citing *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984).

The case shall be remanded to the Commissioner to more fully analyze the opinion of Dr. Chaves and assign a weight accordingly.

### b.  Dr. Joseph Poitier

The Plaintiff asserts that the ALJ erred by failing to consider the opinion evidence or records from Dr. Joseph Poitier, ECF No. [26] at 13.  The Defendant does not specifically address the ALJ's failure to consider the records of Dr. Poitier, but responds generally to Plaintiff's contention that "the ALJ did not consider various doctors who diagnosed psychiatric conditions and prescribed him medication" that the "mere diagnosis of a condition is insufficient to demonstrate the functional limitations it causes," ECF No. [29] at 15.  The medication profile, treatment records, and psychiatric evaluation submitted by Dr. Poitier, however, provide more than a "mere diagnosis," and include recurrent observations of the Plaintiff's flat and/or blunt affect; and, fair insight, judgment, and reliability.  (R. 635-643).  The evaluation of the Plaintiff's functioning is provided via GAF scores in the 45-55 range.[11]  The treatment records indicate that Dr. Poitier saw Plaintiff on multiple occasions and was a treating physician of the Plaintiff. (R. 635-643).  "The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary.  The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

---

[11] The undersigned recognizes that these scores are not determinative of the analysis; but they reflect a judgment of functioning that indicates serious symptoms, including inability to keep a job.  *See* AM. PSYCHIATRIC ASS'N, THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), at 32 (4th ed. Text rev. 2000).  The use of the GAF score was discontinued in DSM V.

Thus, the ALJ erred in failing to consider the opinion evidence or records from Dr. Poitier and to assign a particular weight to such opinion. The case is remanded to the Commissioner to more fully analyze the opinion of Dr. Poitier and assign a weight accordingly.

### c. Dr. Molly Ryan

The Plaintiff asserts that the ALJ erred by failing to consider the opinion evidence or records from Dr. Molly Ryan, ECF No. [26] at 13. The only evidence in the record regarding Dr. Ryan, however, is a "Claimant's Recent Medical Treatment" document submitted by the Plaintiff that lists Dr. Ryan as a doctor that the Plaintiff has seen since the last time his case was updated by the Social Security Administration. (R. 472). Given that the Plaintiff was unrepresented at the hearing, the best practice would have been for the ALJ to request records from Dr. Ryan. The date given for treatment is March 25, 2014. (R. 472). Given the limited evidence from Dr. Ryan in the record, however, the undersigned cannot find that the ALJ erred in failing to consider the evidence from Dr. Ryan. As the case will be remanded, however, these records should be requested, particularly since this is within the "gap" period for which there are no medical records and during which the Plaintiff was hospitalized for psychiatric treatment.

### d. Dr. Jack Weitz

The Plaintiff asserts that the ALJ erred by failing to consider the opinion evidence or records from Dr. Weitz, ECF No. [26] at 13. Dr. Weitz performed a Learning Disabilities Evaluation on the Plaintiff on June 20, 2002 and diagnosed the Plaintiff with persistent depressive disorder, and recommended involvement in mental health treatment. (R. 545). There is no evidence in the record that Dr. Weitz saw the Plaintiff more than on the single occasion during which he performed his evaluation. Therefore, Dr. Weitz is not a treating physician of the Plaintiff and his opinion was not entitled to substantial weight. Additionally, Dr. Weitz's evaluation of the Plaintiff occurred more than 10 years prior to

the relevant time period for the Plaintiff's redetermination of benefits, and thus is of limited relevance to the determination of the Plaintiff's abilities during the relevant time period.  Accordingly, the ALJ did not err in failing to consider the evidence from Dr. Weitz.

### 2.  Non-Medical Opinion Evidence

The Plaintiff also summarily argues that the ALJ erred in failing to consider non-medical evidence in the record, specifically Exhibits 1E - high school records, 2F - childhood speech delayed, 3F – institutional educational plan, 4F – speech therapy evaluation, ECF No. [26] at 13.  The Defendant responds that there is no requirement that the ALJ specifically refer to every piece of evidence in her decision and that Plaintiff's arguments fail because he has not explained how the identified evidence established that the Plaintiff was more limited during the relevant time period, August 1, 2012 through the date of her decision on her March 16, 2015, than found by the ALJ.

An ALJ is obligated to consider a relevant opinion from a non-medical source who has seen the claimant in a professional capacity, and is supposed to provide a discussion of that opinion in her decision. SSR 06–03P; 20 C.F.R. § 404.1513. However, the ALJ is not required to assign any weight to the opinion. SSR 06–03P. Opinion evidence from non-medical sources is evaluated by a variety of factors, including the opinion's consistency with other evidence and the degree to which the source presents evidence to support that opinion. *Id.* Regardless of its source, there is no special weight given to an opinion on whether a claimant is disabled, because that issue is reserved for the Commissioner.  20 C.F.R. § 404.1527(d).

In this case, the ALJ's treatment of the educational records was not error.  The ALJ is not required to assign any weight or specifically refer to the opinions of non-medical sources.  The ALJ did include a discussion of the Plaintiff's educational records in her opinion, focusing on more recent, and thus more relevant, reports from the

Plaintiff's time in high school.  Moreover, the Defendant is correct that the Plaintiff has failed to identify how these dated educational records establish that the Plaintiff was more limited during the relevant time period.  Therefore, the ALJ did not err in her consideration of the non-medical evidence in the record.

### B.  The Determination of the Plaintiff's Credibility

Plaintiff argues that the ALJ's finding that the Plaintiff was not credible concerning statements of intensity, persistence, and the limiting effects of his disability is (1) based upon the wrong standard; and (2) not supported by substantial evidence, ECF No. [26] at 6-14.  The Defendant asserts that the ALJ applied the correct standard and that substantial evidence supports the ALJ's assessment of Plaintiff's symptoms, ECF No. [29] at 5-12.

#### 1.  Standard for Evaluation of Subjective Symptoms

The Plaintiff argues that the ALJ erred in applying the wrong standard in evaluating the Plaintiff's subjective symptoms and making a credibility determination. The Plaintiff argues that Social Security Ruling 16-3p, which became effective on March 28, 2016 can be applied retroactively and that case law applying the policy ruling has established that "while an ALJ may find testimony not credible in part, or whole, she may not disregard it solely because it is not substantiated affirmatively by objective medical evidence," ECF No. [26] at 8.  The Defendant responds that the ALJ issued her opinion in the case at bar on March 6, 2015, prior to the publication of SSR16-3p, and that SSR 16-3p does not apply retroactively, ECF No. [29] at 11.

It is well-established that [r]etroactivity is not favored in the law ... and administrative rules will not be construed to have retroactive effect unless their language requires this result."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988).  Moreover, the Eleventh Circuit has specifically determined that "SSR 16-3p does not apply retroactively because it has no language suggesting,

much less requiring, retroactive application." *Contreras-Zambrano v. Social Security Administration, Commissioner*, --- Fed. Appx. --- , 2018 WL 618420, *1 (11th Cir. 2018) (noting that "the SSA made clear when it republished SSR 16-3p that it would not apply the rule retroactively and did not expect courts to apply the rule retroactively.").

Therefore, the ALJ did not err in applying SSR 96-7p because it was the standard in effect at the time of Plaintiff's hearing and SSR 16-3p does not apply retroactively.

## 2. Credibility Analysis

In considering the Plaintiff's symptoms, the ALJ must follow a two-step process where it first must be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that could be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms. SSR 96-7p. Once this is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent that these limit Plaintiff's functioning. *Id.* If statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record. *Id.*

The responsibility of the fact-finder, the ALJ, is to weigh the Plaintiff's complaints about his symptoms against the record as a whole; this falls to the ALJ alone to make this determination. 20 C.F.R. §§ 404.1529(a), 416.929(a). A clearly articulated credibility finding supported by substantial evidence in the record will not be disturbed by a reviewing court. *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). "[T]he ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988). If the ALJ decides not to credit

such testimony, she must articulate explicit and adequate reasons for doing so. *Hale v. Bowen*, 831 F. 2d 1007, 1011 (11th Cir. 1987). A lack of an explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir.1982). That determination, however, may be affected by the lack of a fully developed record, and should be revisited on remand. For this, the ALJ must examine the entire record.

In the case at bar, the ALJ concluded that the Plaintiff's "daily activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (R. 83).

While the undersigned finds that the ALJ followed the appropriate procedure regarding the credibility determination, the undersigned has concerns regarding whether the determination is supported by substantial evidence in the record. Based upon the need to remand for a full and fair development of the record and to re-evaluate the medical opinion evidence of record, however, it will be necessary to the ALJ to re-evaluate the credibility of the Plaintiff based upon the entirety of the record.[12]

Therefore, the undersigned finds that the case should be remanded for the ALJ to make new credibility assessment based upon a review of the record in its entirety.

C. Development of The Record

The Plaintiff asserts that the ALJ did not properly develop the record as she failed to develop the medical records from the Plaintiff's treating doctors, ECF No. [26] at 13. The Plaintiff asserts that the ALJ is charged with developing a full and fair record and should have sought to develop the record from the Plaintiff's treating doctors, Drs.

---

[12] In this regard, the undersigned notes that the fact that the Plaintiff can shop for and play video games is not evidence that the Plaintiff is not disabled, as the ability to play video games is not evidence that the Plaintiff would be able to sustain fulltime employment. The undersigned recognizes, however, that the ALJ also relied on other evidence in the record.

Chaves, Ryan, and Poitier, especially given the fact that the Plaintiff was unrepresented at the hearing, ECF No. [26] at 8-13. The Defendant responds that the ALJ did fully develop the record, and that the unrepresented Plaintiff did not raise any issue at the hearing regarding the development of additional evidence. The Defendant contends that the record does not contain evidentiary gaps that resulted in unfairness or prejudice to the Plaintiff. Further, the Defendant asserts that the Plaintiff failed to indicate what facts could have been elicited that would change the outcome of this case and failed to show that he was prejudiced by being unrepresented or by the ALJ's actions, ECF No. [30] at 18-19.

In Reply, the Plaintiff states that he was prejudiced by being unrepresented at the hearing because an attorney would have helped him highlight the importance of Dr. Chaves' report and would have provided explanation regarding the interpretation of the educational records, ECF No. [31] at 1. The Plaintiff further argues that his inability to provide a knowing and intelligent waiver of his right to counsel is apparent based on a review of the transcript of the alleged waiver of counsel, ECF No. [31] at 6.[13]

Whether or not a claimant is represented by counsel, the ALJ has a duty to develop a full and fair record. *Ellison v. Barnhart*, 355 F. 3d 1272, 1276 (11th Cir. 2003). This is an onerous task, as the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (internal quotation marks omitted). In determining whether a claimant is disabled, the ALJ must consider the evidence as a whole. *Spencer ex rel. Spencer v.*

---

[13] The undersigned need not reach the question of whether the Plaintiff's waiver of his right to counsel was knowing and intelligent, because the ALJ failed to adequately develop the record under either standard, based on the numerous evidentiary gaps and inconsistencies in the record. *See Kelley,* 761 F.2d at 1540 n. 2 (recognizing "a slightly different standard" for evaluating whether an unrepresented claimant has received a full and fair hearing depending upon whether there has been a valid waiver and noting that, in any case, there must be a showing of prejudice to trigger a remand to the Secretary for reconsideration).

*Heckler*, 765 F.2d 1090, 1093 (11th Cir.1985) (per curiam) (internal quotation marks omitted). The ALJ's duty to develop a full and fair record is heightened when the claimant is not represented by counsel in the administrative proceeding. *See Brown v. Shalala*, 44 F.3d 931, 934–35 (11th Cir.1995); *Kelley v. Heckler*, 761 F.2d 1538, 1540 & n.2 (11th Cir.1985). Nevertheless, the claimant ultimately bears the burden of proving he is disabled and consequently is responsible for producing evidence in support of his claim. *Ellison*, 355 F.3d at 1276. In determining whether a remand is necessary to develop the record, we consider whether there are evidentiary gaps in the record that result in unfairness or clear prejudice to the claimant. *Brown*, 44 F.3d at 935. Therefore, a claimant must demonstrate prejudice before we will conclude his due process rights have been violated to such an extent that the case must be remanded. *Id*. To demonstrate prejudice, the claimant must show "the ALJ did not have all of the relevant evidence before him in the record ..., or that the ALJ did not consider all of the evidence in the record in reaching his decision." *Kelley*, 761 F.2d at 1540.

Herein, there are numerous evidentiary gaps in the record, several emphasized by the ALJ herself. For example, the ALJ noted in her opinion that the medical director of the Psychosocial Rehabilitation Program, Patricia Ares-Romero, M.D., submitted documentation reporting that the claimant was diagnosed with schizoaffective disorder, depressed type and that he was prescribed Celexa, Haldol, and Cogentin, but that "the record was devoid of any contemporaneous treatment notes from Dr. Ares-Romero or Jackson Memorial Hospital." (R. 82). Dr. Ares-Romero, however, states at the bottom of her letter, "Please advise if you require further information." Thus, she invited a request for more detailed information. Moreover, a review of the record suggests that, in fact, Drs. Chaves and Ryan, at least, are both physicians with the Psychosocial Rehabilitation Program at Jackson Memorial Hospital. The address provided for Drs. Chaves and Ryan corresponds to the Jackson Memorial Hospital Highland Pavilion. (R. 658, 472). Dr.

Chaves states in his report that the Plaintiff "has been in this program since [March 25, 2014]" and that "[the Plaintiff] is currently in [the Psychosocial Rehabilitation Program], he is attending activities daily." (R. 658). The undersigned believes that the "treatment program" referred to by Plaintiff during the hearing is actually the Psychosocial Rehabilitation Program at Jackson Memorial Hospital. (R. 102, 115-17, 120-22). The confusion in the record regarding these key pieces of evidence demonstrates that there are "evidentiary gaps in the record that result in unfairness or clear prejudice to the claimant." *Brown*, 44 F. 3d at 935.

The ALJ further states in her opinion that "[d]espite the complaints of allegedly disabling symptoms, the claimant has not taken any medications for those symptoms. At the psychiatric evaluation conducted on September 7, 2012, it was noted that the claimant refused medication even after it was recommended by the doctor. (R. 83). But subsequent to the 2012 evaluation referenced by the ALJ, the Plaintiff began taking medication, as supported by multiple medical opinions in the record. Specifically, Drs. Ares-Romero, Chaves, Poitier, and Ryan all indicate in their reports that the Plaintiff has been prescribed medication to treat his mental illness. Moreover, the Plaintiff's current prescriptions were discussed during the hearing before the ALJ. (R. 106).

The ALJ indicates in her opinion that there is no record evidence of inpatient hospitalizations or periods of decompensation. But Dr. Chaves' report describes two separate "psychiatric hospitalization[s]" that occurred in 2014. (R. 663). The "Claimant's Recent Medical Treatment" form submitted on behalf of the Plaintiff in April 2014 also references the Plaintiff being sent to the mental hospital while incarcerated and being hospitalized at Jackson Memorial Hospital for depression. (R. 472). Additionally, the Plaintiff testified that at one point he had suicidal thoughts and "they kind of locked me up. But instead of them locking me up, they took me to crisis." (R. 111-12). The undersigned suggests that the Plaintiff may have been referencing an in-patient

hospitalization, however, the record is unclear because the ALJ did not ask the Plaintiff to elaborate or clarify his statement.

The Plaintiff has adequately alleged that there are evidentiary gaps in the record that result in clear prejudice to the Plaintiff. The record as a whole reveals that relevant facts, documents, and opinions were omitted from the ALJ's consideration or findings and that there was significant confusion regarding the Plaintiff's involvement in the Psychosocial Rehabilitation Program at Jackson Memorial Hospital. The undersigned finds that the ALJ failed to develop the record regarding the Plaintiff's limitations by failing to request records from the Plaintiff's treating physicians where needed and ignoring or overlooking relevant information before determining that the Plaintiff was not disabled.[14] Therefore, the undersigned recommends that the case be remanded for the ALJ to review the entire record anew to determine the Plaintiff's eligibility.

## VII. CONCLUSION

Based on the foregoing, this Court finds that the ALJ erred by not fully considering the opinion evidence of record and assigning a weight to the Plaintiff's treating physicians and by failing to fully and fairly develop the record. These deficiencies rendered the assessment of the Plaintiff's credibility regarding his mental functioning deficient as well. Thus, the ALJ's determination of the Plaintiff's RFC was not supported by substantial evidence. Therefore, in accordance with the above, it is hereby

ORDERED AND ADJUDGED that the Plaintiff's Motion for Summary Judgment, ECF No. [26], is GRANTED, and that Defendant's Motion for Summary Judgment, ECF No. [30], is DENIED. This matter is REMANDED to the Commissioner pursuant to 42

---

[14] Moreover, not only was the Plaintiff proceeding pro se in the administrative proceedings, but his full scale IQ of 75 was in the borderline range of intellectual abilities and he had obvious problems of comprehension in both hearings before the ALJ.

U.S.C § 405(g), with instructions for the ALJ to fully and fairly develop the record, accurately review and fully assign a weight to the Plaintiff's treating physicians Drs. Chaves and Ryan, and re-evaluate the Plaintiff's credibility, as stated above.

**DONE AND ORDERED** in chambers in Miami, Florida on March 29, 2018

_Andrea M. Simonton_
_____
**ANDREA M. SIMONTON**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

Copies furnished via CM/ECF to:
All counsel of record